# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Timothy CHIRDON et al.,

    Plaintiffs,

v.

BOROUGH OF PLUM,

    Defendant.

Civil Action No. 13-341

## MEMORADUM OPINION

Conti, Chief Judge

## I. Introduction

This case involves a dispute over the right to remove a small bridge or box culvert. Plaintiffs Timothy and Robin Chirdon (collectively the "Chirdons") allege that the bridge was their property and defendant Borough of Plum ("Plum") removed the bridge in violation of the their constitutional rights. Plum asserts there was no constitutional violation because it had a contractual right to remove the bridge. This case also involves the question about when a municipal entity can be held liable for the constitutional violations of its officials.

The parties engaged in robust pre-answer motion practice, including several motions to dismiss, one of which was granted in part and denied in part, an amendment as a matter of course, and a motion to for leave to amend, which was granted. The Chirdons' second amended complaint (ECF No. 48) contains two counts asserting claims under 42 U.S.C. § 1983. Count one seeks redress for the deprivation of a property interest without due process of law in violation of the Fourteenth Amendment. Count three[1] asserts that Plum's removal of the bridge constituted an illegal seizure under the Fourth and Fourteenth Amendments. Plum filed a motion for summary judgment (ECF No. 53), seeking judgment on both counts. Because the

---

1    Count two is a place holder for a dismissed state-law claim.

Chirdons failed to adduce sufficient evidence to establish municipal liability, the court will grant Plum's motion.

## II. Factual Background

### A. *Origin of the Dispute over the Bridge*

The Chirdons, who are husband and wife, live on a roughly triangular piece of property in Plum. (Combined Concise Statement of Material Facts ("CCS") ¶ 1, ECF No. 69; Pls.' Ex. G, ECF No. 64-7.) The Chirdons have lived on this property since 2000. (T. Chirdon Dep. 5:21–23, Apr. 8, 2014, ECF No. 56.) Their property is bordered along one side by McJunkin Road and along another side by Finley Road. (CCS ¶ 2.) A creek runs through the Chirdons' property parallel to Finley Road. (CCS ¶ 3.) A small bridge—described as a box culvert—crossed the creek. Prior to 2008, the Chirdons' only paved access to a public roadway was a driveway leading over the bridge to Finley Road. (CCS ¶¶ 8–9.)

On many occasions since the Chirdons moved to the property, the creek overflowed its banks and flooded the Chirdons' yard. (T. Chirdon Dep. 18:18–19:18.) The water entered the Chirdons' garage and basement at least four times between 2000 and 2008. (*Id.* at 25:4–22.) Timothy Chirdon called Plum many times to report the issue. (*Id.* at 19:24–21:24.) Plum undertook some efforts to alleviate the flooding, including cutting back overgrown vegetation around the creek several times per year, but these efforts did not fix the problem. (*Id.* at 22:4–8.) In 2008, the Chirdons had a series of discussions with William Berchick ("Berchick"), Plum's director of public works, about performing more substantial flood relief work. (*Id.* at 25:23–26:16.) Plum believed the box culvert, which formed the bridge over the creek, impeded the flow of water in the creek and contributed to the flooding events. (Thomas Dep. 41:18–42:15, Mar. 26, 2014, ECF Nos. 56, 64-4.) The Chirdons and Berchick discussed a plan under which Plum would remove the culvert bridge. In return, Plum would install a new driveway connecting to the public roadway at McJunkin Road. (T. Chirdon Dep. 26:17–28:12.)

The parties dispute whether these discussions ever resulted in a definite agreement. No formal written contract was signed. (*Id.* at 29:14–30:3.) The Chirdons had a number of specific requirements for the paving of the driveway. (*Id.* at 29:3–13.) Eventually, Plum created a "spec sheet" that listed the requirements for the driveway, and Timothy Chirdon and Plum borough manager Michael Thomas ("Thomas") signed the sheet. (*Id.* at 29:23–30:3; Thomas Dep. 8:5–21.) The driveway was constructed in November 2008, but the paving was not done according to the specifications agreed to by the Chirdons and the Chirdons' porch was damaged by the contractor. (T. Chirdon Dep. 33:3–34:3; R. Chirdon Dep. 10:14–16, Apr. 8, 2014, ECF No. 56.) On July 1, 2009, the Chirdons' attorney sent Plum a letter outlining the problems with the pavement and stating that the only solution was to remove and replace the asphalt. (Def.'s Ex. I, ECF No. 56.) The letter stated that Timothy Chirdon

> rescinds his permission for [Plum] to remove the bridge connecting his driveway to Finley Road. Mr. Chirdon will only grant permission to remove the bridge and will sign a release/indemnification absolving [Plum] from any liability if he is provided with a check in the amount of $9,311.00 representing the paving cost of a reliable paving company.

(*Id.*)

As a result of the problems with the pavement, in September 2009, the Chirdons sued Plum in state court for breach of contract, negligence, and fraud. (CCS ¶ 18; Def.'s Ex. J, ECF No. 56.) In February 2010, the Chirdons' lawyer sent Plum another letter rescinding permission for Plum to remove the bridge. (T. Chirdon Dep. 34:25–35:16.) On July 28, 2010, the Chirdons and Plum entered into a settlement agreement under which the Chirdons released their claims against Plum in return for $2,000 and the installation of a new top coat and certain repairs. (Def.'s Ex. K, ECF No. 56.) The settlement agreement did not mention the bridge. (*See id.*) The Chirdons, upon advice of counsel, believed the settlement only addressed the faulty driveway and did not give Plum any rights to the bridge. (T. Chirdon Dep. 48:5–15; T. Chirdon Decl., Pls.' Ex. F, ECF No. 64-6.) On October 10, 2012, the Chirdons' counsel sent another

letter to Plum and reiterated that the Chirdons did not grant Plum permission to remove the bridge. (Def.'s Ex. M, ECF No. 56.) Plum's solicitor responded in a letter dated November 9, 2012, that it was Plum's position that the Chirdons' approval was not needed for Plum to remove the bridge. (Def.'s Ex. N, ECF No. 56.) Plum stated that since the litigation over the driveway was resolved, it had the authority to remove the culvert and intended immediately to do so. (*Id.*) In response to this letter, the Chirdons began parking a vehicle on top of the bridge as a form of protest. (T. Chirdon Dep. 49:12–50:6.)

### B. Removal of the Bridge

On November 15, 2012, Thomas sent Berchick an e-mail instructing him to remove the culvert. (Def.'s Ex. O, ECF No. 56.) Thomas informed Berchick that the Chirdons were now parking a vehicle on the culvert in an attempt to prevent its removal and instructed him to have the police department tow the vehicle if necessary. (*Id.*)

On the morning of November 19, 2012, six to eight trucks from the Plum department of public works arrived at the Chirdons' property. (R. Chirdon Dep. 22:14–24:15.) One police car accompanied the public works vehicles. (*Id.*) Robin Chirdon spoke briefly to the police officer and she gave the officer her phone to speak to Timothy Chirdon. (*Id.* at 26:21–29:3.) The officer explained he was there to ensure that the property was safely removed, but he could not intervene in the legal dispute between the Chirdons and Plum. (*Id.*) While Robin Chirdon spoke with the police officer, department of public works employees attached chains to the Chirdons' tractor, which was parked on the culvert, and pulled it off the culvert and onto the Chirdons' driveway. (*Id.* at 31:1–32:17.) After speaking with the police officer, whom she described as "nice," Robin Chirdon, accompanied by her young daughter, returned to the house. (*Id.* at 32:24–33:15.) The workers used machinery to remove the bridge, which took the rest of the day. (*Id.* at 33:19–34:3.)

Since the removal of the culvert in November 2012, the Chirdons have used the driveway to McJunkin Road to access their property. After the culvert was removed, there was one episode of flooding on the property. (*Id.* at 34:4–22.)

### C. Authority of Thomas

Thomas, as Plum borough manager, had the authority to direct the employees of the department of public works, including the public works director. (Thomas Dep. 33:14–15, 34:16–17.) The police department reported solely to the mayor, and Thomas had no authority over the police and could only request their assistance. (*Id.* at 34:2–5.) The police would not have mistakenly considered a request from Thomas to be an order. (*Id.* at 35:23–36:3.) Thomas testified, "[T]he chief of police at the time had made the point to me on many occasions, you are not my boss, I don't report to you." (*Id.* at 36:6–8.)

## III. Legal Authority

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). An issue of fact is material when it "might affect the outcome of the suit under the governing law"—factual disputes that are "irrelevant or unnecessary" will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*; *see Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof.").

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). A court must not engage in credibility

determinations at the summary judgment stage. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998). Summary judgment must be entered, "'after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

## IV. Discussion

Plum argues, among other things, that it is entitled to judgment as a matter of law with respect to all claims against it because the Chirdons cannot establish municipal liability. A municipality may be liable under 42 U.S.C. § 1983, but not on the basis of vicarious liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). A municipality is subject to liability as an entity only when the constitutional injury is caused by "the execution of a government's policy or custom." *Id.* at 694. Municipal liability arises from an individual's conduct under three circumstances:

> (1) the individual acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, (2) the individual himself has final policy-making authority such that his conduct represents official policy, or (3) a final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred.

*Hill v. Borough of Kutztown*, 455 F.3d 225, 245 (3d Cir. 2006).

In this case, the Chirdons offered no evidence that the removal of the bridge was the result of either a formal policy or widespread custom or usage with the force of

6

law.[2] The Chirdons assert that Plum is liable because "[t]he decision to take the bridge was an official decision of the body's officers." (Pls.' Resp. 16, ECF No. 63.) The Chirdons identify the testimony of Thomas and the e-mails between Thomas and the public works department as evidence of a decision by Plum to remove the bridge. (*Id.* at 16–17.) The Chirdons argue that the single decision to remove the bridge is sufficient to establish municipal liability. (*Id.*) There is no dispute that Thomas ordered the department of public works to remove the bridge or ratified that decision, and that, as borough manager, he had supervisory authority over the department of public works. (Def.'s Ex. O, ECF No. 56; Thomas Dep. 34:16–17.)

Under certain circumstances, municipal liability may be predicated on the single decision of a municipal policymaker. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). "[N]ot every decision by municipal officers automatically subjects the municipality to § 1983 liability," however. *Id.* at 481 (plurality opinion). "Municipal liability attaches only where the decisionmaker possess final authority to establish municipal policy with respect to the action ordered." *Id.* Courts must distinguish between officials exercising discretionary authority, which does not give rise to municipal liability, and officials exercising policymaking authority, which does. *Id.* at 482–83. Whether an official has final policymaking authority is a question of state law, "which may include valid local ordinances and regulations." *Praprotnik*, 485 U.S. at 125 (plurality opinion); *see id.* at 126 (discussing the St. Louis City Charter); *Pembaur*, 475 U.S. at 484–85 (discussing the Ohio Revised Code). To determine whether an official has final policymaking authority, "a court must determine (1) whether, as a matter of state law, the official is responsible for making policy *in the particular area* of municipal business in question, and (2) whether the official's

---

2    The second amended complaint states that "[i]t was the policy and custom of Plum, including its police, to … act on the directives of Michael Thomas." (Second Am. Compl. ¶ 31, ECF No. 48.) The Chirdons did not point to any evidence in the record establishing this policy, custom, or practice.

7

authority to make policy in that area is *final and unreviewable.*" *Hill*, 455 F.3d at 245 (citations omitted). "[T]he identification of those officials whose decisions represent the official policy of the local governmental unit is … a legal question to be resolved by the trial judge *before* the case is submitted to the jury." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).[3]

In this case, the court must determine whether Thomas is responsible for making policy in the area of public works and, if so, whether his policymaking authority in that area is final and unreviewable. To answer these questions, the court must consider the applicable state law. Under the Pennsylvania Borough Code, "[t]he council of any borough may, at its discretion at any time, create by ordinance the office of borough manager and may in like manner abolish the same." 53 Pa. Stat. § 46141 (2012).[4] "The powers and duties of the borough manager shall be regulated by ordinance." 53 Pa. Stat. § 46142 (2012).[5] No Plum ordinances have been made part of the summary judgment record in this case, and these documents are not "readily available" such that the court could take judicial notice of them. *See Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*, 391 F3d 312, 321 (1st Cir. 2004) (noting that municipal ordinances are not generally subject to the doctrine of judicial notice and "those courts which have more liberally construed the rules of judicial notice as

---

3   Although the determination about whether an official is a final policymaker is generally a question of law for the court, some courts have found allegations that a municipal entity, as a matter of custom, delegated final policymaking authority to an official may present issues of fact. *E.g.*, *Kujawski v. Bd. of Comm'rs*, 183 F.3d 734, 739 (7th Cir. 1999). This issue does not arise in this case because the record contains no evidence about a custom with the force of law. *Cf. id.* (noting evidence "that the Board never reviewed [the alleged policymaker's] personnel decisions, that [the alleged policymaker] was 'in charge' of the department, [and] that [the alleged policymaker] called … meetings and set employment policies for the … department").

4   Subsequent to the events in this case, this section was amended and consolidated at 8 Pa. Cons. Stat. § 1141 (2014).

5   This section is now consolidated at 8 Pa. Cons. Stat. § 1142 (2014).

to local ordinances and codes do so only when the law to be noticed is readily available and there are no issues about accuracy or authenticity"). Some courts have determined whether an official had policymaking authority even in the absence of official copies of the relevant ordinances or procedure manuals. In *Wulf v. City of Wichita*, 883 F.2d 842 (10th Cir. 1989), the Court of Appeals for the Tenth Circuit determined that the city manager, not the police chief, had final policymaking authority to fire police officers based upon the testimony in the record and quotations from city ordinances. *Id.* at 868.

Based upon the record in this case, the court cannot determine that Thomas had policymaking authority to order the removal of the bridge. While Thomas's testimony establishes that he had supervisory authority over the public works director and public works department, supervisory authority is not the equivalent of final policymaking authority. *See Smith v. Cent. Dauphin Sch. Dist.*, Civil No. 05-1003, 2007 WL 2262936, at *4 (M.D. Pa. Aug. 6, 2007) ("A municipality does not automatically delegate final policymaking authority to an employee when it delegates the discretion to carry out the duties necessary and proper to perform her job."); *see also Pembaur*, 475 U.S. at 481–82 (plurality opinion) ("The fact that a particular official … has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."); *Williams v. Butler*, 863 F.2d 1398, 1402 (8th Cir. 1988) ("[A] a very fine line exists between delegating final policymaking authority to an official, for which a municipality may be held liable, and entrusting discretionary authority to that official, for which no liability attaches."). For example, "mere authority to implement pre-existing rules is not authority to set policy." *Killinger v. Johnson*, 389 F.3d 765, 771 (7th Cir. 2004). The relevant ordinances are not in evidence and the limited testimony concerning Thomas's authority is insufficient to establish that he is a final policymaker. From this record, the court cannot determine the scope of Thomas's authority over the public works department. The Chirdons adduced insufficient

evidence to show that Thomas had authority to set borough policy with respect to removing the bridge. Moreover, even if the court could find Thomas had policymaking authority, no evidence in the record shows that this authority was final and unreviewable.

The Chirdons failed to meet "their burden of establishing facts sufficient to support their claim of municipal liability." *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 215 (3d Cir. 2001); *accord Kelly v. Borough of Carlisle*, 622 F.3d 248, 265 (3d Cir. 2010) (finding the plaintiff's "perfunctory attempt to establish a record by citing a handful of Pennsylvania statutes concerning the authority of police chiefs in his reply brief is insufficient to meet his burden of proof in this regard"). Because establishing municipal liability is an essential element of each of the Chirdons' federal claims, Plum is entitled to summary judgment.[6] The court need not reach Plum's other arguments that it is entitled to summary judgment because the issue of municipal liability is dispositive.

## V. Conclusion

For the reasons set forth above, after reviewing the summary judgment record, the court concludes that there are no disputed issues of material fact with respect to municipal liability and Plum is entitled to judgment as a matter of law on the claims against it. Plum's motion for summary judgment will be granted. An appropriate order will be entered.

    Dated: February 20, 2015            /s/ Joy Flowers Conti
                                                      Joy Flowers Conti
                                                      Chief United States District Judge

---

6    In the amended complaint (ECF No. 13), the Chirdons sued Thomas in his official capacity as borough manager. The court dismissed Thomas because "[a] suit against a governmental official in his or her official capacity is treated as a suit against the governmental entity itself." *A.M ex rel. J.M.K. v. Luzerne Cnty. Juvenile Detention Ctr.*, 372 F.3d 572, 580 (3d Cir. 2004). The Chirdons did not sue Thomas or any other Plum official in an individual capacity.